J-S78023-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| LARRY L. WALTERS | |
| Appellant | No. 436 MDA 2014 |

Appeal from the Judgment of Sentence February 11, 2014
In the Court of Common Pleas of Cumberland County
Criminal Division at No(s): CP-21-CR-0000104-2013

BEFORE:  GANTMAN, P.J., JENKINS, J., and MUSMANNO, J.

MEMORANDUM BY JENKINS, J.:                **FILED JANUARY 12, 2015**

Appellant Larry Walters appeals from the judgment of sentence entered in the Cumberland County Court of Common Pleas following his jury trial conviction for harassment.[1]  Appellant now challenges the sufficiency of the evidence and the legality of his sentence.  We affirm Appellant's conviction, but vacate his judgment of sentence and remand for resentencing.

In its Pa.R.A.P. 1925(a) opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Appellant raises the following issues for our review:

_____

[1] 18 Pa.C.S. § 2709(a)(7).

I. Did the Commonwealth establish beyond a reasonable doubt that Appellant, Larry L. Walters, was guilty of M3 harassment?

II. Did the term of incarceration imposed on Appellant, Larry L. Walters, by the trial court exceed the statutory maximum?

Appellant's Brief, p. 5 (all capitals removed).

When examining a challenge to the sufficiency of evidence, our standard of review is as follows:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super.2011), *appeal denied*, 32 A.3d 1275 (Pa.2011).

Regarding Appellant's sentencing claim, we observe:

The scope and standard of review applied to determine the legality of a sentence are well established. If no statutory authorization exists for a particular sentence, that sentence is illegal and subject to correction. An illegal sentence must be vacated. In evaluating a trial court's application of a statute, our

- 2 -

standard of review is plenary and is limited to determining whether the trial court committed an error of law.

*Commonwealth v. Leverette*, 911 A.2d 998, 1001-1002 (Pa.Super.2006) (internal citations omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the thorough and well-reasoned opinion of the Honorable Christylee L. Peck, we conclude the Appellant's sufficiency of the evidence claim merits no relief. The trial court opinion comprehensively discusses and properly disposes of Appellant's claim. *See* Trial Court Pa.R.A.P. 1925(a) Opinion, dated May 30, 2014, at 2-20 (finding: "[I]n summary, [Appellant] continued to contact [the victim] after being informed twice that she wanted no further contact with him, and contacted her in such bizarre fashion, from a lawsuit, to clippings from a book on Psychotherapy, to combative handwritten notes, culminating in [Appellant's] unsettling antics at the Club's Christmas party. Such action by [Appellant] made [the victim] fear for her and her family's safety. Accordingly, there was sufficient evidence that [Appellant] repeatedly communicated with [the victim] with the intent to harass her from which the jury could find [Appellant] guilty."). Accordingly, we affirm Appellant's conviction on the basis of the trial court opinion.

However, following Appellant's conviction, the trial court imposed a sentence of two to twenty-three months of incarceration. Appellant, the Commonwealth, and the trial court all agree that this sentence exceeded the

- 3 -

statutory limits for a harassment conviction.[2]  *See* Appellant's Brief, p. 43;

Commonwealth's Brief, p. 20; 1925(a) Opinion, p. 21.   We agree.

Therefore, we vacate Appellant's sentence and remand the matter for

resentencing.[3]

Conviction affirmed.  Judgment of sentence vacated.  Matter remanded

for resentencing.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/12/2015

---

[2] Harassment, as a misdemeanor of the third degree, carries a statutory maximum sentence of one year of incarceration.  *See* 18 Pa.C.S. §§ 1104 & 2709(c)(2).

[3] To the extent Appellant challenges the discretionary aspects of his sentence, our vacation of the sentence and remand for resentencing renders this claim moot.

COMMONWEALTH : IN THE COURT OF COMMON PLEAS OF
: CUMBERLAND COUNTY, PENNSYLVANIA
:
v. :
:
LARRY L. WALTERS : CP-21-CR-0104-2013

## IN RE: OPINION PURSUANT TO PA. R.A.P. 1925

Peck, J., May 30, 2014 –

On October 31, 2013, after a jury trial, Defendant was found guilty at Count 2, Harassment, a misdemeanor of the third degree.[1] A mistrial was declared on Count 1, Stalking, a misdemeanor of the first degree, after the jury reported that it was deadlocked as to that charge.[2] On February 11, 2013, Defendant was sentenced at Count 2 to undergo a period of incarceration in the Cumberland County Prison of not less than two nor more than 23 months, with credit for 30 days previously served, and to pay the costs of prosecution and a fine of $100.00.[3] On March 7, 2014, Defendant filed a Notice of Appeal.[4] In accordance with Pennsylvania Rule of Appellate Procedure 1925(b), Defendant has filed the following concise statement of matters complained of on appeal:

1. Even viewing the evidence in the light most favorable to the Commonwealth as verdict winner, there was insufficient evidence as a matter of law to support the verdict of guilt for M3 Harassment (Count 2).
2. The incarceration and consecutive nature of the sentence was excessive considering the totality of the conduct alleged in the testimony and that none of the individual instances of conduct complained of were frightening/threatening alone but instead at worst more of an annoying and upsetting nature to the alleged victim and her husband.[5]

---

[1] Order of Court, In Re: Verdict/Appear for Sentence/Bail (October 31, 2013).

[2] Id.

[3] Order of Court, In Re: Sentencing (February 11, 2014).

[4] Notice of Appeal, filed March 7, 2014.

[5] Defendant's Concise Statement of the Errors Complained of on Appeal, March 28, 2014, ¶¶ 1-2.

A-1

This Court's opinion in support of our Order of Court, In Re: Sentence, is written pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

## STATEMENT OF FACTS

Lorrie Preston, a resident of Hampden Township and a member of The Susquehanna Appalachian Trail Club (the Club), testified at Defendant's trial.[6] She testified that the Club is a nonprofit hiking organization that has been in existence for 60 years.[7] In addition to leading hikes and creating opportunities for members of the community to get outdoors, the Club also maintains twenty miles of the Appalachian Trail from Route 225 to Rausch Gap in Dauphin County.[8] At the time of trial, Mrs. Preston was the Vice-President and Program Chair of the organization, a member of the Membership Committee, and sometimes hike leader.[9]

Ms. Preston testified that she first came to know Defendant when she joined the Club in 2005.[10] She joined the Club in order to participate in weekday hikes and met Defendant through those hikes.[11] She and Defendant occasionally exchanged words but she considered him no more than an acquaintance.[12] In 2006, Defendant began contacting Mrs. Preston at home, inquiring if she would like to scout a hike or sweep a hike with him.[13] Mrs. Preston testified that it was unusual for one member of the Club to randomly call another member in order to plan such activities.[14] She explained that every quarter members must turn in a list of hikes they wish to lead the next quarter.[15] In order to provide the details of the hike to other members who may wish to participate, a member

---

[6] Notes of Testimony, In Re: Jury Trial Proceedings, October 30 and 31, 2013 (Peck, J.) (hereinafter "N.T. at __") at 13, 14.

[7] N.T. at 14.

[8] N.T. at 14.

[9] N.T. at 14.

[10] N.T. at 15.

[11] N.T. at 15.

[12] N.T. at 16.

[13] N.T. at 16.

[14] N.T. at 16, 17.

[15] N.T. at 17.

A-2

first scouts the hike, figuring out the specifics like how to get to the hike, where to park, and the type of terrain.[16] Sweeping a hike, the other activity Defendant suggested to Mrs. Preston, is the responsibility of the last person in line on a hike.[17] The sweeper ensures that no hikers get off the trail or end up lost.[18]

Mrs. Preston testified that the first time Defendant called her, Defendant reached her answering machine.[19] She returned his call and left him a message explaining that she was not interested.[20] She did not, however, return any subsequent calls from Defendant.[21]

In 2005, 2006, or possibly the beginning of 2007, Mrs. Preston received a few mailings at her house from Defendant.[22] Those mailings consisted of articles torn out of a National Rifle Association magazine which Defendant then annotated with his own political viewpoints, including his views on the right to bear arms.[23] Mrs. Preston testified that these mailings were also sent to other members of the Club.[24] She described the annotations of Defendant as "sort of irrational."[25] She also testified that Defendant's writings were a "little bit scary" but that they did not appear to address her specifically and she did not take it personally.[26] She further explained that she had not discussed Defendant's political viewpoints with him previously and that, in general, members of the Club did not discuss issues that might cause friction.[27]

---

[16] N.T. at 17.

[17] N.T. at 17.

[18] N.T. at 17.

[19] N.T. at 18.

[20] N.T. at 18.

[21] N.T. at 18.

[22] N.T. at 18.

[23] N.T. at 18.

[24] N.T. at 18.

[25] N.T. at 19.

[26] N.T. at 19.

[27] N.T. at 19.

According to Mrs. Preston, Defendant was not active with the Club between 2007 and 2011.[28] Then, in June of 2011, Mrs. Preston received a mailing from Defendant.[29] She described it as "just folded and stapled in a couple of different places" with no envelope.[30] The mailing was another request from Defendant asking Mrs. Preston to scout a hike with him about one and a half hours east of Harrisburg called Ringing Rocks.[31] In addition to information about the hike, a cartoon about a nude beach was also included in the mailing from Defendant.[32] But, according to Mrs. Preston, what particularly caught her attention was a heart that Defendant had drawn over the 'i' in her first name.[33] She testified,

> I felt really creepy about it. I just didn't understand why he would do that. He knew I was married. It really made me uncomfortable, but I didn't know how I was going to handle it.[34]

Because of how uncomfortable it made her, Mrs. Preston decided to keep the letter with the heart over the 'i'.[35]

In the middle of July 2011, the Club was having a picnic, and Mrs. Preston was to lead a small hike before the picnic.[36] The hike was to begin at 4:00 p.m. so she arrived at 3:30 p.m.[37] Defendant was already there. As Mrs. Preston put it, she "was shaking like a leaf that day at the picnic."[38] Nonetheless, Mrs. Preston led the hike as scheduled, and

---

[28] N.T. at 20.

[29] N.T. at 21.

[30] N.T. at 22.

[31] N.T. at 22-23.

[32] N.T. at 23.

[33] N.T. at 23.

[34] N.T. at 24.

[35] N.T. at 24.

[36] N.T. at 25.

[37] N.T. at 25.

[38] N.T. at 25.

A-4

Defendant went along.[39] After the hike, Mrs. Preston went to get another bottle of water from the picnic coolers and Defendant approached her.[40] She testified that she "got really nervous."[41] Even so, she told Defendant that she was not interested in scouting or leading any hikes with him, or any other man, and that she was happily married.[42] Then, as a result of the attention Defendant was focusing on her, Mrs. Preston did not lead any hikes the rest of the summer and began staying away from Club activities.[43]

However, when the new quarter began, Mrs. Preston decided to lead a hike, choosing Longwood Gardens.[44] She had previously led a hike at Longwood Gardens, and Defendant had not attended.[45] She chose it for her next hike specifically for that reason.[46] She publicized the hike as all members of the Club do by submitting it to the Club newsletter, *Bushwack Bulletin*.[47] Defendant left Mrs. Preston a message informing her that he would be participating in the Longwood Gardens hike.[48] After receiving Defendant's message, Mrs. Preston spent the rest of the night and the next day deciding how she could get out of leading the hike.[49] In the end, she canceled it due to lack of interest by other members.[50] Mrs. Preston's husband, Bob Preston, personally called Defendant and let him know that he and his wife were cancelling the Longwood Gardens

---

[39] N.T. at 25.

[40] N.T. at 26.

[41] N.T. at 26.

[42] N.T. at 26.

[43] N.T. at 27-28.

[44] N.T. at 28.

[45] N.T. at 28.

[46] N.T. at 28.

[47] N.T. at 28.

[48] N.T. at 28.

[49] N.T. at 28.

[50] N.T. at 29.

hike.[51] Shortly thereafter, Mrs. Preston informed the Club president, Karen Balaban, that she was no longer comfortable leading hikes for the Club.[52]

At a Christmas party that same year, Mrs. Preston and Defendant were both in attendance.[53] However, Mrs. Preston testified that she "blatantly ignored" Defendant and had no interaction with him.[54] The next time Mrs. Preston saw Defendant was at the Club's March banquet the following year.[55] Defendant attempted to speak to Mrs. Preston at the banquet but she walked away from him.[56]

In June of 2012, Mrs. Preston received a 20 page packet in the mail from Defendant.[57] As with a previous mailing from Defendant, this packet was not in an envelope but rather consisted of folded papers held together with masking tape.[58] The packet included recipes, something Mrs. Preston had never discussed with Defendant, a U.S.O (United Services Organizations) flier, articles from the NRA magazine, a George Will column at the bottom of which Defendant had written "liberals destroying truth and freedom in America," and an editorial by Wayne LaPierre, the Executive Vice President of the NRA.[59] The packet also included a Miles Kimball advertisement depicting "a very innocent little girl sitting on the stairs with her teddy bear or stuffed animal or something like that" and information on gardening for wildlife, one of Mrs. Preston's interests which she shared with members of the Club.[60] From there the material in the packet became more objectionable: a comic of people making love and a page of Playboy's Party Jokes that included pictures of naked women and two jokes checked off by

---

[51] N.T. at 29.

[52] N.T. at 30.

[53] N.T. at 30.

[54] N.T. at 30.

[55] N.T. at 31.

[56] N.T. at 31.

[57] N.T. at 31.

[58] N.T. at 32.

[59] N.T. at 33.

[60] N.T. at 34.

*A-6*

Defendant, one of which stated: "What has four arms and four legs and never works out? Marriage."[61] Continuing towards the more objectionable, the next item in the packet was an article titled "The Vibrator," followed by four cartoons titled "Cucumbers are Better than Men Because," and another page containing the following lines: "The average cucumber is at least six inches long; cucumbers stay hard for a week; and, a cucumber won't tell you size doesn't matter."[62] On the last page of the packet was an article about personal security, including 20 steps to enhance home security.[63]

Mrs. Preston testified that she was "absolutely sick" after reading through the 20 page packet, that she felt dirty, and that "it really ticked [her] off."[64] Either the day she received the packet, or the next, Mrs. Preston's husband, Bob, called the Hampden Township Police Department.[65] For her part, Mrs. Preston wrote Defendant a letter which she sent, certified mail, on June 15, 2012.[66] That letter informed Defendant that Mrs. Preston felt harassed by his mailings, that his mailings were inappropriate, that the 20 page packet was totally unacceptable, and that she had no interest in sharing recipes or reading about Defendant's political views or being subjected to sexual materials.[67] And to make sure Defendant understood, Mrs. Preston told him, in the letter, that she had "absolutely no interest in any further contact with [him]."[68] She also informed Defendant that any further contact from him would be reported to the police and that he was not welcome on any hikes she might lead through the Club.[69]

---

[61] N.T. at 35-36.

[62] N.T. at 36-37.

[63] N.T. at 37.

[64] N.T. at 37-38.

[65] N.T at 38.

[66] N.T. at 39.

[67] N.T. at 40.

[68] N.T. at 41.

[69] N.T. at 41.

A-7

The mail carrier attempted, unsuccessfully, to deliver the letter on three occasions.[70] After the third failed attempt, the letter was returned to Mrs. Preston as refused.[71] Determined to get the letter to Defendant, Mrs. Preston and her husband planned on personally handing the letter to Defendant at an upcoming Club picnic.[72] However, Defendant did not attend the picnic, the first social event held by the Club that Defendant had not attended in quite some time.[73] In her continued attempt to deliver the letter to Defendant, Mrs. Preston returned to the post office and was told to send the letter with delivery confirmation.[74] Although this would not require Defendant to sign for the letter, Mrs. Preston would at least get confirmation that the letter was delivered to Defendant's residence.[75] Mrs. Preston mailed the letter on August 2, 2012, and did receive confirmation that it had been delivered.[76] However, the letter was then sent to the Club's P.O. Box with Defendant's address crossed out and replaced by the Club's address.[77] According to Mrs. Preston, the letter did not look like it had been opened.[78] The following was written on the envelope:

> I got this trash 2 August of the full moon. Queen Lorrie incised because I won't read her insanity. She is not the first nut to do this, for the world to know an infantile, neurotic victim of domestic violence and hypocrite. Someone must be the example. Get help, queen. Louise Sis got the same Xeroxes as Lorrie. Why isn't Louise badgering me[?] Susan D. told Lorrie the woodpecker joke with the punchline sweetest ash I stuck my pecker in. Why isn't Susan under attack? Shakespeare wrote, he protested too much. Police know a guilty party when people say too much. Lorrie said, I

---

[70] N.T. at 43.

[71] N.T. at 43.

[72] N.T. at 43-44.

[73] N.T. at 44.

[74] N.T. at 44.

[75] N.T. at 44.

[76] N.T. at 44.

[77] N.T. at 46.

[78] N.T. at 46.

A-8

have a good marriage, good husband, love my family, etc. Just what a victim of domestic violence would say.[79]

Also written on the envelope was the phrase, "a lunatic Libra tart coquet."[80]

Mrs. Preston testified that, around the same time the above letter was forwarded to the Club, Defendant filed a hand-written civil action against Mrs. Preston and the Club.[81] Mrs. Preston read at length from Defendant's lawsuit which is worth quoting in detail here, starting with paragraph 5 of the suit:

> Number 5. Lorrie Preston for some unknown reason is indignant and offended, sending the plaintiff certified and receipt registered mail. The plaintiff, after dealing with other neurotic women, returned the letters.
>
> Number 6. Towards the end of Bullfrog Valley hike, Susan Donmoyer told Clarence's woodpecker joke. The woodpecker says that's the sweetest ash I stuck my pecker in. Lorrie is not offended by this adult humor.
>
> Number 7. During hikes in 2006/2007, Lorrie, like Anna Pruet . . . would tag along with the plaintiff like a lovesick schoolgirl.
>
> Number 8. Lunch. After one hike the only place the plaintiff could sit was across from Lorrie. She enjoyed the plaintiff licking sauce off her fingers.
>
> Number 9. The last hike Lorrie lead, she arranged to sit with the plaintiff again.
>
> Number 10. The plaintiff told his friend, John Zeranco about Lorrie. John said, she likes you, Larry. She wants you.
>
> Number 11. The plaintiff no longer has the answering machine of silly, giddy Lorrie, barely able to think or talk to explain she wouldn't be a sweep on the plaintiff's hike. She enjoyed it. She was not indignant or offended.[82]

---

[79] N.T. at 86.

[80] N.T. at 86.

[81] N.T. at 60.

[82] N.T. at 61-62.

*A*-9

Addressing the above, Mrs. Preston testified that any claims contained in those paragraphs regarding her are false.[83] In response to the lawsuit, Mrs. Preston hired an attorney and also returned to the Hampden Township Police Department seeking advice.[84] She next had her attorney draft a defiant trespass letter, which she mailed to Defendant, warning Defendant that if he continued to bother Mrs. Preston the police would be called and he would be arrested.[85]

Although Mrs. Preston hired an attorney to defend against Defendant's lawsuit, the Club's attorney stepped in and filed a motion to dismiss the case.[86] In response, Defendant filed a Rebuttal of Petition to Dismiss.[87] Paragraph 8 of Defendant's Rebuttal reads, "The plaintiff has no desire to contact Looney Preston, a hysterical lunatic, any more than talk to his crazy ex-wife. As for the plaintiff being incoherent, he is just following Looney Preston's lead."[88] Mrs. Preston testified that she was "absolutely terrified" at this point and was starting to worry about her safety.[89]

Despite Defendant's claim in paragraph 8 above that he has no desire to have contact with Mrs. Preston, he continued to contact her, including sending an item to Mrs. Preston's home address and addressed to MyDamn V.P., Lorrie Preston.[90] On the back of this mailing[91], Defendant wrote, in part, "Why she's an ass crying wolf[?] Who knows. She needs a therapist to deal with her irrational fears, not lawyers. What's her

---

[83] N.T. at 64.

[84] N.T. at 65.

[85] N.T. at 65.

[86] N.T. at 66. Apparently, Defendant's lawsuit named the Club as well as Mrs. Preston as defendants. Since Mrs. Preston was, at the time, an officer of the Club, the Club's insurance covered the cost of an attorney to defend the suit on behalf of the Club and Mrs. Preston. N.T. at 66.

[87] N.T. at 67.

[88] N.T. at 70.

[89] N.T. at 71.

[90] N.T. at 70, 72.

[91] Commonwealth's Exhibit 9.

A-10

problem[?]"[92] In response, the Club's attorney sent Defendant a letter informing him that he cannot directly contact any person named in the lawsuit initiated by Defendant.[93]

On the 24th or 25th of October of 2012, Mrs. Preston was the featured speaker at the Club's Fall membership meeting in the Community Room of the Camp Hill Giant.[94] The event was advertised, including Mrs. Preston's participation, in the *Bushwack Bulletin*, through e-mail, and on the Club's website.[95] Over concern that Defendant would attend the event, Mrs. Preston's husband stayed downstairs to watch for Defendant while Mrs. Preston prepared for her presentation upstairs.[96] Defendant did show up at the Camp Hill Giant on the day of Mrs. Preston's presentation and spoke with Mrs. Preston's husband.[97] Shortly thereafter, Defendant added Mrs. Preston's husband as a defendant in his lawsuit through a Modification Continuation of Complaint.[98] Like the original complaint, the Modification contained many paragraphs of Defendant's ramblings.[99] On November 20, 2012, Defendant filed a Petition for Injunction in Cumberland County requesting that the court "overrule the defiant trespass letter [sent to Defendant by Mrs. Preston] until the Court rules on this matter . . . and Complaint . . . ."[100]

In December of 2012, the Prestons received another mailing from Defendant at their home.[101] Mrs. Preston testified that the writing on this mailing, which was four pages of the book *Healing the Shame that Binds You*, by John Bradshaw, was Defendant's handwriting.[102] Mrs. Preston went on to testify in more detail regarding the

[92] N.T. at 73.

[93] N.T. at 74.

[94] N.T. at 75, 117.

[95] N.T. at 75.

[96] N.T. at 75.

[97] N.T. at 76.

[98] N.T. at 76-77.

[99] N.T. at 77-79.

[100] N.T. at 80, 84.

[101] N.T. at 87.

[102] N.T. at 87.

pages contained in the mailing and noted that the general topic was Psychotherapy.[103] She also testified that Defendant had written on one of the pages "I don't even want you to send me a recipe."[104] This statement was clearly a reference to the letter Mrs. Preston had sent to Defendant on August 2, 2012, although that letter, when forwarded to the Club, appeared not to have been opened.

Mrs. Preston and her husband did not attend the Club Christmas party in 2012 or the hike the following day due to a desire to avoid Defendant.[105] On December 21st, Mrs. Preston and her husband went to the Hampden Township Police Department with every document in their possession relating to Defendant.[106] As Mrs. Preston testified, she had decided that "enough is enough."[107] She explained her feelings at the time as follows:

> All I wanted was to be left alone. I really didn't think it was too much to ask in any normal person, the ignoring, the tone verbally, the not calling him back. All the steps that I had taken which I felt were the way I should handle myself, all of those things. I was trying to get it through his head, all he has to do is leave me alone. My letter said it. I gave him the benefit of the doubt. Enough is enough. Please don't contact me. The lawyer's letter. All the Prestons, he said in the letter, all the Prestons want is peace, to be left alone. That's all we want, to be left alone.
>
> He did not leave me alone. He escalated this attack. Every single time it was coming in faster and faster. There was nothing I could do to stop it. I felt I absolutely had no recourse. The last thing I wanted to do was get involved in a lawsuit and press charges, but there came a point where there was nothing else I could do. I was in danger. My life felt like it was in danger. My husband's life felt like it was in danger. I wanted a stop to it, and I did what I had to do. I went to the police and pressed charges.[108]

---

[103] N.T. at 88.

[104] N.T. at 89.

[105] N.T. at 91.

[106] N.T. at 92.

[107] N.T. at 92.

[108] N.T. at 92-93.

Finally, when asked how the actions of Defendant had affected her, Mrs. Preston concluded by saying, "everything I know is a shambles right now."[109]

Although the Prestons did not attend the Club's Christmas party in 2012, Sharon Shellenberger, one of the directors of the Club, did.[110] She testified that Defendant was also there and that he brought a box to the party which had a picture of a gun on the outside.[111] Defendant opened the box and showed the contents to Ms. Shellenberger which, to her, appeared to be a real gun.[112] She testified that he then walked by her with the box, and, at that point, she realized it was a chocolate gun.[113] She told Defendant that she felt that a chocolate gun was inappropriate for a party with small children.[114] Defendant said, "then just cut it up," which Ms. Shellenberger did after taking a picture of it.[115] According to Ms. Shellenberger, the outside of the box gave no indication that it contained a chocolate gun rather than a real gun.[116]

The day after the Christmas party, Ms. Shellenberger led a hike in Harrisburg, PA.[117] Anyone interested in participating in the hike was to meet Ms. Shellenberger at Fisher Plaza behind the Capitol building.[118] The first to arrive was Defendant.[119] Within a few minutes of Defendant's arrival more participants began showing up.[120] Destinations included as part of the hike were the Capitol building and the Governor's mansion.[121] Because of security at those two locations, Ms. Shellenberger requested that hikers leave

---

[109] N.T. at 96.

[110] N.T. at 154.

[111] N.T. at 154-55.

[112] N.T. at 155.

[113] N.T. at 155.

[114] N.T. at 155.

[115] N.T. at 155.

[116] N.T. at 156.

[117] N.T. at 156.

[118] N.T. at 156.

[119] N.T. at 156.

[120] N.T. at 157.

[121] N.T. at 157.

A-13

any items behind that might trigger the metal detectors that they would be required to pass through.[122] Yet, despite Ms. Shellenberger's request, Defendant brought two pocket knives to the Capitol building and triggered the metal detector.[123] Security took Defendant's knives and returned them when the group exited.[124] This scene was repeated at the Governor's mansion.[125]

Robert Preston, the husband of Lorrie Preston and a member of the Club, also testified for the Commonwealth.[126] In particular, he was present in late October of 2012 when Mrs. Preston was the featured speaker at the Club's Fall membership meeting in the Community Room of the Camp Hill Giant.[127] At that meeting, Mr. Preston waited downstairs by the entrance specifically to intercept Defendant if he attempted to attend the meeting.[128] Defendant did come to the Giant that evening, and Mr. Preston asked him not to attend the meeting.[129] Defendant responded that he was going to the meeting unless the Club asked him not to attend.[130] Mr. Preston reminded Defendant of the letter sent to Defendant by Mrs. Preston's attorney and then informed Defendant that, if he attended the meeting, he would have no alternative except to call the police.[131] Mr. Preston testified that Defendant became upset and began swearing, telling Mr. Preston that if he could not attend the meeting he would be attending the Christmas party.[132] Defendant told Mr. Preston that he would see him in court and then left.[133] A few days later,

---

[122] N.T. at 157.

[123] N.T. at 157.

[124] N.T. at 157.

[125] N.T. at 157.

[126] N.T. at 164.

[127] N.T. at 174.

[128] N.T. at 174-75.

[129] N.T. at 175.

[130] N.T. at 175.

[131] N.T. at 176.

[132] N.T. at 176.

[133] N.T. at 176.

Defendant added Mr. Preston to his lawsuit.[134] Mr. Preston testified that Defendant's statement that he would be attending the Christmas party caused him and his wife to not attend.[135]

Mr. Preston also testified that he was informed of the events at the Christmas party and the hike the following day involving Defendant.[136] According to Mr. Preston, that information factored into his and his wife's decision to speak to the police in December.[137]

The Commonwealth also called Trisha Sanders, the president of the Club, to testify.[138] As president, Ms. Sanders was familiar with the allegations in Defendant's civil lawsuit.[139] She testified that, despite Defendant's claim in Paragraph 1 of his Complaint, she had never been abused or stalked by a member of the Club.[140]

At the conclusion of the trial, the jury found Defendant guilty at Count 2, Harassment, a misdemeanor of the third degree.[141] A mistrial was declared on Count 1, Stalking, a misdemeanor of the first degree, after the jury reported that it was deadlocked as to that charge.[142] On February 11, 2013, Defendant was sentenced at Count 2 to undergo a period of incarceration in the Cumberland County Prison of not less than two nor more than 23 months, with credit for 30 days previously served, to pay the costs of prosecution, and a fine of $100.00.[143] Defendant then filed this timely appeal.

---

[134] N.T. at 176.

[135] N.T. at 177.

[136] N.T. at 177.

[137] N.T. at 178.

[138] N.T. at 148.

[139] Commonwealth's Exhibit 8.

[140] N.T. at 151.

[141] Order of Court, In Re: Verdict/Appear for Sentence/Bail (October 31, 2013).

[142] Id.

[143] Order of Court, In Re: Sentencing (February 11, 2014).

A-15

## DISCUSSION

### Sufficiency of the Evidence.

Defendant claims there was insufficient evidence as a matter of law to support the jury's guilty verdict. For the reasons below, we find that there was sufficient evidence and that Defendant's claim is therefore meritless.

In reviewing sufficiency of evidence claims, a court:

> must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all the elements of the offense. Additionally, to sustain a conviction, the facts and circumstances which the Commonwealth must prove, must be such that every essential element of the crime is established beyond a reasonable doubt. . . . The fact finder is free to believe all, part, or none of the evidence presented at trial.

Commonwealth v. Moreno, 14 A.3d 133, 136 (Pa. Super. 2011) (internal citations omitted). "It is well settled that a jury or a trial court can believe all or a part of or none of a defendant's statements, confessions or testimony, or the testimony of any witness." Commonwealth v. Morales, 2014 WL 1669802, No. 629 CAP (Pa. Apr. 28, 2014). The jury is not obliged to accept a defendant's evidence. Commonwealth v. Morales, 2014 WL 1669802, No. 629 CAP (Pa. Apr. 28, 2014).

### Harassment

A defendant is guilty of Harassment if, "with intent to harass, annoy or alarm another," the defendant: "(7) communicates repeatedly in a manner other than specified in paragraphs (4), (5) and (6)." 18 P.C.S.A. § 2709(a)(7). Paragraphs (4), (5), and (6) state:

> (4) communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures;
> (5) communicates repeatedly in an anonymous manner;
> (6) communicates repeatedly at extremely inconvenient hours;

H-16

18 Pa.C.S.A. § 2709(a)(4), (5), and (6). "An intent to harass may be inferred from the totality of the circumstances." Commonwealth v. Cox, 72 A.3d 719, 721 (Pa. Super. 2013).

The facts supporting the jury's guilty verdict are as follows:

In June of 2011, Mrs. Preston received a mailing from Defendant. She described it as "just folded and stapled in a couple of different places" with no envelope. The mailing was a request from Defendant asking Mrs. Preston to scout a hike with him about one and a half hours east of Harrisburg. In addition to information regarding the hike, a cartoon about a nude beach was also included in the mailing from Defendant. Defendant had also drawn a heart over the 'i' in Mrs. Preston's first name. In response, Mrs. Preston told Defendant at a Club picnic that she was not interested in scouting or leading any hikes with him, or any other man, and that she was happily married.

Later that same year, Mrs. Preston decided to lead a hike, choosing Longwood Gardens. She had previously led a hike at Longwood Gardens, and Defendant had not attended. She chose it for her next hike specifically for that reason. Defendant left Mrs. Preston a message informing her that he would be participating in the Longwood Gardens hike. Because of Defendant's intention to attend the hike, Mrs. Preston canceled it.

In June of 2012, Mrs. Preston received a 20 page packet in the mail from Defendant. The packet included recipes, something Mrs. Preston had never discussed with Defendant, a U.S.O flier, articles from the NRA magazine, a George Will column at the bottom of which Defendant had written "liberals destroying truth and freedom in America," and an editorial by Wayne LaPierre, the Executive Vice President of the NRA. The packet also included a Miles Kimball advertisement depicting "a very innocent little girl sitting on the stairs with her teddy bear or stuffed animal or something like that" and information on gardening for wildlife. The packet also included a comic of people making love; a page of Playboy's Party Jokes that included pictures of naked women and two jokes checked off by Defendant, one of which stated: "What has four arms and four legs and never works out? Marriage"; an article titled "The Vibrator"; followed by four

cartoons titled "Cucumbers are Better than Men Because"; and another page containing the following lines: "The average cucumber is at least six inches long; cucumbers stay hard for a week; and, a cucumber won't tell you size doesn't matter." On the last page of the packet was an article about personal security, including 20 steps to enhance home security.

At this point, Mrs. Preston wrote Defendant a letter. That letter informed Defendant that Mrs. Preston felt harassed by his mailings, that his mailings were inappropriate, that the 20 page packet was totally unacceptable, and that she had no interest in sharing recipes or reading about Defendant's political views or being subjected to sexual materials. And to make sure Defendant understood, Mrs. Preston told him, in the letter, that she had "absolutely no interest in any further contact with [him]." She also informed Defendant that any further contact from him would be reported to the police and that he was not welcome on any hikes she might lead through the Club. The letter was returned to Mrs. Preston as undeliverable. Mrs. Preston mailed the letter again on August 2, 2012, and did receive confirmation that it had been delivered. However, the letter was then sent to the Club's P.O. Box with Defendant's address crossed out and replaced by the Club's address. The following was written on the envelope:

> I got this trash 2 August of the full moon. Queen Lorrie incised because I won't read her insanity. She is not the first nut to do this, for the world to know an infantile, neurotic victim of domestic violence and hypocrite. Someone must be the example. Get help, queen. Louise Sis got the same Xeroxes as Lorrie. Why isn't Louise badgering me[?] Susan D. told Lorrie the woodpecker joke with the punchline sweetish ash I stuck my pecker in. Why isn't Susan under attack? Shakespeare wrote, he protested too much. Police know a guilty party when people say too much. Lorrie said, I have a good marriage, good husband, love my family, etc. Just what a victim of domestic violence would say.

Also written on the envelope was the phrase, "a lunatic Libra tart coquet." Based upon later correspondence, the jury was presented with evidence that Defendant read Mrs. Preston's letter prior to sending it to the Club and therefore knew that Mrs. Preston

A–18

wanted no contact with him. Nevertheless, Defendant continued to contact Mrs. Preston, directly and indirectly.

Around the same time the above letter was forwarded to the Club, Defendant filed a hand-written civil action against Mrs. Preston and the Club, which included false claims regarding Mrs. Preston. Next, Mrs. Preston had her attorney draft a defiant trespass letter, which she mailed to Defendant, warning Defendant that if he continued to bother Mrs. Preston the police would be called and he would be arrested.

Defendant continued to contact Mrs. Preston, including sending an item to Mrs. Preston's home address and addressed to MyDamn V.P., Lorrie Preston. On the back of this mailing, Defendant wrote, in part, "Why she's an ass crying wolf[?] Who knows. She needs a therapist to deal with her irrational fears, not lawyers. What's her problem[?]" In response, the Club's attorney sent Defendant a letter informing him that he cannot directly contact any person named in the lawsuit initiated by Defendant.

On the 24th or 25th of October of 2012, Mrs. Preston was the featured speaker at the Club's Fall membership meeting in the Community Room of the Camp Hill Giant. Defendant showed up at the Camp Hill Giant on the day of Mrs. Preston's presentation and spoke with Mrs. Preston's husband, who asked him to leave. Prior to leaving, Defendant told Mr. Preston that he would be attending the Club's Christmas party. Shortly thereafter, Defendant added Mr. Preston as a defendant in his lawsuit.

On November 20, 2012, Defendant filed a Petition for Injunction in Cumberland County requesting that the court "overrule the defiant trespass letter [sent to Defendant by Mrs. Preston] until the Court rules on this matter . . . and Complaint . . . ." Thus, Defendant received and understood that letter.

In December of 2012, after Defendant had now received two letters informing him that Mrs. Preston wanted no contact with him, the Prestons received another mailing from Defendant at their home consisting of four pages of the book *Healing the Shame that Binds You*, by John Bradshaw. Defendant had written on one of the pages "I don't even want you to send me a recipe." This statement was clearly a reference to the letter Mrs.

Preston had sent to Defendant on August 2, 2012, showing, as mentioned above, that Defendant had read the letter and was therefore aware that Mrs. Preston did not want to have any contact with him.

Although the Prestons did not attend the Club's Christmas party in 2012, Sharon Shellenberger, one of the directors of the Club, did. She testified that Defendant was also there and that he brought a box to the party which had a picture of a gun on the outside. Defendant opened the box and showed the contents to Ms. Shellenberger which, to her, appeared to be a gun. She testified that when Defendant walked by her with the box she realized it was a chocolate gun. Although Mrs. Preston was not present, the jury could have reasonably inferred from Defendant's stated intention to attend the Christmas party, specifically addressed to Mr. Preston, that his actions at the party had been planned for Mrs. Preston with the intent to harass her.

Thus, in summary, Defendant continued to contact Mrs. Preston after being informed twice that she wanted no further contact with him, and contacted her in such bizarre fashion, from a lawsuit, to clippings from a book on Pyschotherapy, to combative handwritten notes, culminating in Defendant's unsettling antics at the Club's Christmas party. Such action by the Defendant made Mrs. Preston fear for her and her family's safety. Accordingly, there was sufficient evidence that Defendant repeatedly communicated with Mrs. Preston with the intent to harass her from which the jury could find Defendant guilty. Therefore this claim is without merit.

## Sentence of the Court

Defendant next challenges the sentence imposed by this Court as excessive in light of the totality of the Defendant's conduct. We disagree.

In general, "[s]entencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." Commonwealth v. Perry, 883 A.2d 599, 602 (Pa.Super. 2005). A sentence constitutes an abuse of discretion if:

> the sentence imposed . . . either exceed[s] the statutory limits
> or [is] manifestly excessive. In this context, an abuse of

A-20

> discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

Id. "In determining whether a sentence is manifestly excessive, the appellate court must give great weight to the sentencing court's discretion, as he or she is in the best position to measure factors such as the nature of the crime, the defendant's character, and the defendant's display of remorse, defiance, or indifference." Commonwealth v. Mouzon, 828 A.2d 1126, 1128 (Pa. Super. 2003). Accordingly, the sentencing court "has broad discretion in choosing the range of permissible confinements which best suits a particular defendant and the circumstances surrounding his crime." Commonwealth v. Boyer, 856 A.2d 149, 153 (Pa. Super. 2004). "In setting sentence, a court has discretion . . . to run the sentence concurrently with or consecutively to other sentences being imposed." Mouzon, 828 A.2d at 1130.

Defendant was sentenced to 2 to 23 months incarceration, the top of the standard range, to be served consecutively to any current sentence Defendant was serving.[144] As the minimum of the sentence imposed was within the standard range, it falls far short of being manifestly excessive. However, we now realize that the maximum term of incarceration to which we sentenced Defendant exceeds the statutory maximum of one year. Accordingly, we respectfully request that the Court affirm Defendant's minimum term of incarceration but remand for resentencing so that we may correct our error. Despite our error, we will provide our reasoning for the maximum term of incarceration imposed as it will apply equally to our resentencing of Defendant shall the Court remand for that purpose.

---

[144] Transcript of Proceedings, In Re: Sentence Colloquy, February 11, 2014 (Peck, J.) (hereinafter "Sentencing at __") at 5.

Defendant, at sentencing, indicated that he would be returning to his home in Landisburg, PA, at the conclusion of his incarceration.[145] We therefore felt it appropriate to provide for supervision by Cumberland County Adult Probation for as long as statutorily permissible to discourage Defendant from reinitiating contact with the Prestons upon his release from prison. To that end, we set Defendant's maximum sentence at 23 months. Now realizing that we exceeded the statutory maximum, upon remand we would resentence Defendant to a maximum period of incarceration of 12 months in conformity with the statutory maximum for a misdemeanor of the third degree.

With respect to running Defendant's sentence consecutively to any other sentence, that was within our discretion, and we found no reason to allow Defendant to avoid the consequences of his actions by running his sentence concurrent with any others, particularly in light of the impact his actions had, and continue to have, on the Prestons. As Mr. Preston testified at trial, Mrs. Preston has been going to a counselor as a result of Defendant's actions, and

> she still is not sleeping the best. She is still afraid. She doesn't know what is going to happen after tomorrow . . . . She just really is shaken, shaken up by all of this. And we are hoping that she can heal through this and get feeling better.[146]

Defendant should therefore be denied relief on this claim.

## CONCLUSION

This Court concludes that there was sufficient evidence to support the jury's verdict of guilty. This Court further concludes that it property sentenced Defendant to a minimum sentence of two months in jail and that the sentence imposed shall run consecutively to any sentence the Defendant is already serving. These issues raised by Defendant on appeal, therefore, are without merit. This Court erred, however, in sentencing the Defendant to an upper end sentence of 23 months, as the maximum sentence allowed by law for his conviction is 12 months. Accordingly, it is respectfully

---

[145] Sentencing at 8.

[146] N.T. at 179.

A-22

requested that the case be remanded to correct the upper end of Defendant's sentence, but that in all other respects the Defendant's appeal be denied.

BY THE COURT,

Christylee L. Peck,   J.

Matthew P. Smith, Esq.
Chief Deputy District Attorney

John M. Shugars, Esq.
Senior Assistant Public Defender

A-23