J-S46004-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RASHAN MICKENS | |
| Appellant | No. 2557 EDA 2014 |

Appeal from the Judgment of Sentence July 18, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000351-2013

BEFORE: MUNDY, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY MUNDY, J.: **FILED AUGUST 14, 2015**

Appellant, Rashan Mickens, appeals from the July 18, 2014 aggregate judgment of sentence of life imprisonment without the possibility of parole, imposed after a jury found him guilty of one count each of first-degree murder, possession of a firearm with an altered manufacturer's number, and possession of an instrument of crime (PIC).[1] After careful review, we affirm.

The record and trial court opinion provide the following facts and procedural background of this case. On May 1, 2012 at approximately 6:20 a.m., police found Darrick Trawick (Decedent) dead. Decedent's body was on the porch of a rooming house located at 1317 West Erie Avenue in Philadelphia, where Decedent resided. An autopsy determined that the

---

[1] 18 Pa.C.S.A. §§ 2502(a), 6110.2(a), and 907(b), respectively.

cause of death was a single gunshot contact wound to Decedent's chest from a 0.25 caliber bullet. Appellant, who resided in the adjoining rooming house at 1319 West Erie Avenue,[2] was subsequently arrested in connection with the shooting of Decedent, but claimed the shooting was in self-defense as Decedent was attacking him in Appellant's room.

Appellant frequently targeted Decedent with homophobic slurs and, occasionally, physical violence. According to two other residents of the rooming house, Sheila Booker and Wayne Ebron, Decedent was not violent and did not attempt to fight back when Appellant harassed him.

Specifically, Booker testified to the persistent conflict between Decedent and Appellant. She stated that Decedent was not the "violent type." *Id.* at 111-112. She recalled that on the evening of the shooting, Decedent came to her room upset because Appellant had ripped his jacket and took his cell phone during a physical altercation earlier that day. *Id.* at 107. Decedent told Booker that Appellant was "doing it again … something is going to happen tonight." *Id.* at 111. Decedent also showed Booker that he was carrying two "weights" for protection. *Id.* Booker said she knew Decedent was "scared because he actually had tears in his eyes." *Id.* at 112. Booker encouraged Decedent "to confront [Appellant] because you can't keep running…. He keeps coming over here doing stuff to you." *Id.*

---

[2] 1317 West Erie and 1319 West Erie are adjoining residences with a common front porch that a railing divides.

Similarly, Ebron recalled that on the afternoon before the murder, he purchased beer from Appellant out of Appellant's room,[3] which was located in the building at 1319 West Erie Avenue. N.T., 7/16/14, 58. While he was in Appellant's room, Ebron saw a 0.25 caliber semi-automatic handgun and part of a TEC-9 submachine gun in Appellant's room. *Id.* at 62. A short time later, Ebron heard Appellant state he was "getting tired of that f[**]got" and that he intended to "f[**]k that n[**]ga up," referring to Decedent. *Id.* at 65. Later that evening, while speaking to Ebron on the phone, Appellant said "the f[**]got[, Decedent,] started that s[**]t again." *Id.* at 67. Ebron also said that Appellant told him he "was out there fighting [Decedent,] but the boy would not swing back." *Id.* at 68. Ebron testified that Appellant always referred to Decedent as "a little f[**]got, a little f[**]got boy." *Id.* at 72.

A third resident of the rooming house, John Ward, testified that he observed two verbal altercations between Appellant and Decedent on the day leading up to the murder. The first occurred in the afternoon. The second argument occurred in the evening, during which Decedent asked Appellant where his phone was and why Appellant had ripped his jacket. *Id.* at 170-172. Later that night, when Ward went to Appellant's room to

_____

[3] Appellant admitted that he sold cigarettes, beer, marijuana, and crack/cocaine out of his room to the other tenants of the rooming houses. N.T., 7/17/14, at 147, 177.

purchase two cigarettes, he saw Decedent lying motionless on the hallway floor outside Appellant's room. *Id.* at 171, 174. Appellant told Ward that he and Decedent "went at it," and Ward observed a cut on Appellant's forehead. *Id.* at 176. Ward and Appellant moved Decedent outside to the porch of 1319 West Erie Avenue, and Appellant lifted Decedent's body over the railing to the porch of 1317 West Erie. *Id.* at 176-178.

At trial, Appellant admitted to being in a fistfight with Decedent between 5:00 p.m. and 6:00 p.m. on April 30, 2012, which lasted 30 minutes. N.T., 7/17/14, at 156. Later, Appellant claimed that Decedent came to Appellant's apartment around 1:00 to 1:30 a.m. on the morning of May 1, 2012. *Id.* at 157. At that point, Decedent allegedly brandished a hammer and hit Appellant in the forehead with it. *Id.* at 158. Appellant then claimed that Decedent pushed his way into Appellant's room and continued to swing the hammer. *Id.* at 160. In response, Appellant picked up a .25 caliber handgun, pointed it at Decedent, and told him to leave. *Id.* at 161-162. At that point, Appellant maintains he does not know what happened because "[e]verything happened so fast. … The gun goes off. I heard it go off. I am looking. [Decedent] didn't fall or anything. He just looked at me and said, oh, s[**]t[.] He turned around and he runs out[.]" *Id.* at 162. Appellant claimed that Decedent dropped the hammer in his room. *Id.* at 189-190.

Appellant then walked to the Temple University Hospital, where he received stitches and staples for his wounds. *Id.* at 166. Specifically, his medical records showed that he was a walk-in patient at 3:23 a.m. on May 1, 2012, with complaints that he was hit with a hammer in the forehead and left posterior scalp while being robbed. *Id.* at 130-131. He was discharged at 6:47 a.m. on the same day after his wounds were closed with staples. *Id.* at 137. Following his discharge, he went to stay with a friend and did not return to the rooming house "[b]ecause [he] already had seen what happened and [he] was afraid and [he] didn't want to go back." *Id.* at 167.

Booker discovered Decedent's body on the porch of 1317 West Erie Avenue at approximately 6:00 a.m. on May 1, 2012 and immediately called the police. *Id.* at 113-114. Paramedics pronounced Decedent dead at 6:20 a.m. *Id.* at 242. The medical examiner determined the cause of death was a gunshot wound to the chest. *Id.* at 250. He further testified, "the end of the weapon was in direct contact with [Decedent's] body when it was discharged." *Id.* at 247. The medical examiner recovered a bullet from Decedent's chest. *Id.*

On May 1, 2012, Police executed a search warrant on Appellant's room and collected swabs of the doorjamb of the front door, a cutout from bloodstained blue curtains on the front window, a bloodstained bath towel, a bloodstained hand towel, and a green tote bag. N.T., 7/17/14, at 4-15, 27. The green tote bag contained vials of marijuana, a 0.25 caliber handgun

manufactured by Raven Arms, a TEC-9 handgun, 29 additional 9-millimeter cartridges, and a box of 37 additional 0.25 caliber cartridges. *Id.* at 16-22, 27. The Raven Arms 0.25 caliber gun had a fired cartridge casing that was not properly expelled from the gun along with a second, misfed cartridge in the gun barrel (i.e., a "stovepipe"), and four cartridges in the magazine. *Id.* at 22, 77-78. The TEC-9 was loaded with one chambered cartridge and 26 cartridges inside the magazine. *Id.* at 21. Both guns had obliterated serial numbers. *Id.* DNA swabs of both guns tested positive for Appellant's DNA. *Id.* at 55-57. Moreover, Decedent was excluded as a contributor to the DNA samples from the guns and Appellant's front doorjamb. *Id.* at 58. A ballistics expert later matched the bullet recovered from Decedent's chest to the 0.25 caliber Raven Arms handgun discovered in Appellant's room with Appellant's DNA on it. *Id.* at 83.

On May 1, 2012, Ebron informed Appellant in a phone call that the police were searching his room. *Id.* at 169. Appellant hung up on Ebron, and turned his phone off to avoid Ebron's repeated calls. *Id.* Appellant admitted that he did not return to the rooming house "[b]ecause [he] was afraid, basically. [He] kn[e]w [Decedent] [was] dead[.] [He was] really scared. [Killing Decedent] wasn't [Appellant's] intention at all." *Id.* Appellant went to his girlfriend's residence, never returning to the rooming house.

On May 9, 2012, an arrest warrant was issued for Appellant. On July 26, 2012, he was arrested near 5500 Washington Avenue in Philadelphia, which was around his girlfriend's residence. *Id.* at 139. On January 11, 2013, the Commonwealth filed an information, charging Appellant with the above-mentioned offenses, as well as one count each of possession of a firearm prohibited, abuse of a corpse, possession with the intent to deliver, and one additional count of possession of a firearm with an altered manufacturer's number.[4] On July 15, 2014, a four-day jury trial commenced. On July 18, 2014, the jury found Appellant guilty of one count each of first-degree murder, possession of a firearm with an altered manufacturer's number, and PIC. The Commonwealth *nolle prossed* the remaining charges. That same day, the trial court sentenced Appellant to a mandatory sentence of life without the possibility of parole for the first-degree murder conviction, and two and one-half to five years' incarceration on each of the two other convictions, concurrent to the life without parole sentence.

---

[4] 18 Pa.C.S.A. §§ 6105(a)(1), 5510, and 35 P.S. § 780-113(a)(30), respectively.

On July 28, 2014, Appellant filed post-sentence motions, which the trial court denied without a hearing on August 4, 2014. On September 3, 2014, Appellant filed a timely notice of appeal.[5]

On appeal, Appellant presents two issues for our review.

> 1.    Whether the trial [court] committed an error of law when it concluded that the evidence sustaining [] Appellant's conviction for murder was sufficient as a matter of law where the Commonwealth's own evidence made it impossible to conclude beyond a reasonable doubt that [] Appellant acted maliciously and did not act in justifiable self-defense[?]
>
> 2.    Whether the trial [court] abused its discretion in failing to consider that the jury's verdict that [] Appellant did not act in self[-]defense shocked one's sense of justice.

Appellant's Brief at 5.[6]

Appellant first challenges the sufficiency of the evidence to support his first-degree murder conviction. Specifically, Appellant contends the evidence was insufficient to prove he acted with malice because he shot Decedent in self-defense. Appellant's Brief at 24. "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Diamond**, 83 A.3d 119,

---

[5] Appellant and the trial court have complied with Pennsylvania Rule of Appellate procedure 1925.

[6] Appellant does not challenge his convictions for possession of a firearm with an altered manufacturer's number or PIC.

126 (Pa. 2013) (citation omitted), *cert. denied,* **Diamond v. Pennsylvania**, 135 S. Ct. 145 (2014). "In reviewing the sufficiency of the evidence, we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the jury's verdict beyond a reasonable doubt." **Commonwealth v. Patterson**, 91 A.3d 55, 66 (Pa. 2014) (citation omitted), *cert. denied*, **Patterson v. Pennsylvania**, 135 S. Ct. 1400 (2015). "To obtain a conviction of first[-]degree murder, the Commonwealth must prove that a human being was unlawfully killed, that the defendant perpetrated the killing, and that the defendant acted with malice and a specific intent to kill." **Diamond**, **supra**; **see also** 18 Pa.C.S.A. § 2501(a) (providing a person commits criminal homicide by causing the death of another human being); **Id.** § 2502(a), (d) (specifying first-degree murder is a criminal homicide committed by an "intentional killing," which is a "willful, deliberate and premeditated killing[]"). The Commonwealth may prove a killing was intentional solely through circumstantial evidence. **Commonwealth v. Houser**, 18 A.3d 1128, 1133 (Pa. 2011), *cert. denied*, **Houser v. Pennsylvania**, 132 S. Ct. 1715 (2012). Accordingly, the fact-finder may infer that the defendant acted with malice and had the specific intent to kill from evidence that the defendant used a deadly weapon on a vital part of the victim's body. **Id.** at 1133-1134.

We conclude the Commonwealth presented sufficient evidence to convict Appellant of first-degree murder. Appellant shot Decedent in the chest with a 0.25 caliber handgun. Moreover, the gun was in direct contact with Decedent's body when Appellant pulled the trigger.

To show a motive for killing Decedent, the Commonwealth introduced evidence of Appellant targeting Decedent with homophobic slurs, and occasionally physical attacks. The Commonwealth also presented testimony that Decedent did not engage Appellant when Appellant harassed him. On cross-examination, Appellant admitted that he often called Decedent a "f[**]got" because he believed Decedent was gay and did not want to interact with him. N.T., 7/17/14, at 183. Specifically, on the day leading up to the murder, Ebron heard Appellant state he was "getting tired of that f[**]got" and that he intended to "f[**]k that n[**]ga up." N.T., 7/16/14, at 65.

The medical examiner testified that Decedent died from the gunshot wound, which severed Decedent's aorta. The bullet responsible for the wound was recovered from Decedent's body. It matched a 0.25 caliber gun discovered in a tote bag in Appellant's locked room. Appellant's DNA was found on the gun, and Decedent's DNA was excluded from the same. Appellant admitted to pointing the 0.25 caliber gun at Decedent and declared that the gun then went off. N.T., 7/17/14, at 162. Appellant also admitted that the 0.25 caliber gun used to kill Decedent was his. ***Id.*** at 175.

This evidence is sufficient to support a jury's finding that Appellant unlawfully killed Decedent, and Appellant acted with malice and the specific intent to kill. **See Diamond**, **supra**; **Houser**, **supra**.

Despite shooting Decedent with a gun in contact with Decedent's chest, Appellant claims the evidence presented by the Commonwealth was insufficient to disprove Appellant's claim of self-defense beyond a reasonable doubt. Appellant's Brief at 24. Specifically, Appellant contends that the blood evidence and the hospital records show that the altercation and shooting occurred in Appellant's room. **Id.** at 25. From this, Appellant deduces that Decedent was the aggressor, not Appellant, and Appellant had no duty to retreat. **Id.** Moreover, Appellant argues the evidence that Decedent carried a weapon, a chain, or weights to defend himself proves that Appellant did not provoke or continue the use of force. **Id.** at 26. Accordingly, Appellant concludes that the Commonwealth did not prove beyond a reasonable doubt that Appellant was not acting in justifiable self-defense. **Id.**

We have set forth our standard of review for claims of insufficient evidence above. In addition, we note that if a defendant presents evidence raising an issue of self-defense, the Commonwealth has the burden to disprove it beyond a reasonable doubt. **Houser**, **supra** at 1135. The Commonwealth meets that burden if it proves any one of the following: (1) the defendant was not free from fault in provoking or continuing the conflict

that resulted in the killing; (2) the defendant did not reasonably believe he was in imminent danger of death or serious bodily injury, and it was not necessary to kill in order to avoid that danger; or (3) the defendant violated a duty to retreat or avoid the danger. ***Commonwealth v. Mouzon***, 53 A.3d 738, 741 (Pa. 2012). Further, "[a]lthough the Commonwealth is required to disprove a claim of self-defense … a jury is not required to believe the testimony of the defendant who raises the claim." ***Houser***, ***supra*** (quotation marks and citation omitted). Nonetheless, "the Commonwealth cannot sustain its burden of proof solely on the fact finder's disbelief of the defendant's testimony." ***Commonwealth v. Torres***, 766 A.2d 342, 345 (Pa. 2001). Accordingly, we must determine whether the affirmative evidence presented by the Commonwealth was sufficient to disprove Appellant's claim of self-defense.

Here, the physical evidence and the testimony were sufficient to negate self-defense. The only evidence presented by Appellant was his own self-serving testimony that was contradicted by the Commonwealth's evidence. The Commonwealth presented sufficient evidence to show that Appellant was not free from fault in provoking or continuing the conflict that led to the killing. All of the evidence established that Appellant frequently targeted Decedent with verbal, and sometimes physical, attacks. The testimony of Ebron and Booker was that Decedent did not respond to Appellant's harassment or defend himself. Ebron stated that on the day

leading up to the murder, he heard Appellant say he was sick of Decedent and that he was going to hurt Decedent. Decedent went to Booker nervous and scared about what Appellant was going to do that night. From this, the jury was free to infer that Appellant also provoked the altercation that led to the shooting.

Multiple pieces of evidence contradicted Appellant's claim that the conflict and shooting occurred in Appellant's room. The DNA evidence excluded Decedent from all of the samples taken of the inside of Appellant's room, including the sample from the front doorjamb. Further, Decedent's body was found on the porch of 1317 West Erie Avenue, and Ward testified that he helped move Decedent from the hallway outside of Appellant's room. This suggests that Decedent was never in Appellant's room. Further, at the time of the incident, Appellant was 5 feet 9 inches tall, weighed 225 pounds, and was 33 years old, which is younger and larger than Decedent, who was 6 feet tall, weighed 160 pounds, and was 42 years old. The physical discrepancy between the two men casts doubt on Appellant's claim that Decedent was able to overcome Appellant's resistance and push his way into Appellant's room.

Moreover, the evidence negated Appellant's claim that Decedent attacked him with a hammer and then dropped the hammer in Appellant's room before the two struggled to gain control of the gun. Police did not recover a hammer, or any other weapon, besides Appellant's two guns, from

Appellant's room nor near Decedent's body, despite Appellant's testimony that Decedent dropped the weapon in his room and Appellant locked the door before going to the hospital following the shooting. Additionally, Ward testified that he did not see a weapon in the hall or on Decedent's person when he helped Appellant move Decedent to the front porch. Further, the DNA evidence excluding Decedent's DNA from the 0.25 caliber gun, which contradicted Appellant's claim that Decedent attempted to gain control of the gun before the shooting. The jury was free to credit the preceding evidence and reject Appellant's testimonial account of the night, and we will not reweigh the evidence. Accordingly, the Commonwealth presented sufficient evidence to prove beyond a reasonable doubt that Appellant was not free from fault in provoking or continuing the conflict that led to the killing.

Alternatively, the physical evidence proved that Appellant did not reasonably believe he was in imminent danger of death or serious bodily injury, and it was not necessary to kill in order to avoid that danger. Appellant testified that Decedent assaulted him with a hammer, hitting him in the forehead and the side of the face. According to Appellant, this took place in Appellant's room and Decedent dropped the hammer when Appellant retrieved his gun. N.T., 7/17/14, at 178. As we noted above, police did not recover a weapon from Appellant's room or from Decedent's body. Police also excluded Decedent's DNA from Appellant's room and from the two guns. Moreover, Appellant's testimony was inconsistent. On direct

examination, Appellant stated that Decedent would not stop attacking him with the hammer. *Id.* at 161. However, on cross-examination, Appellant said that Decedent dropped the object when he picked up the 0.25 caliber gun. Additionally, Appellant's wounds were relatively minor as he was able to have them treated at Temple University Hospital in approximately three hours. Based on this evidence, the jury was free to conclude that Appellant was not in imminent danger of death or serious bodily injury at the time he pulled the trigger.

Further, Appellant's actions after the shooting discredit his claim of self-defense. Ward testified that when he spoke with Appellant before they moved Decedent's body, Appellant told Ward that he and Decedent "went at it." Appellant did not state that he shot Decedent or that he did so in self-defense. Appellant then locked his room and left for the hospital, never to return to the rooming house. At the hospital, Appellant claimed he had been robbed and hit with a hammer. Next, Appellant went to a friend's house where he spoke with Ebron, who told him police were searching Appellant's room and other residents were saying Appellant shot Decedent. In response, Appellant hung up and turned his cellular phone off to avoid Ebron's repeated calls. Appellant evaded police for nearly three months at his girlfriend's house until he was arrested. Appellant's flight when he knew police were looking for him following the shooting is evidence of his consciousness of guilt. *See Commonwealth v. Lukowich*, 875 A.2d 1169,

1173 (Pa. Super. 2005) (citation omitted), *appeal denied*, 885 A.2d 41 (Pa. 2005). Accordingly, the Commonwealth provided sufficient evidence to disprove the claim of self-defense and Appellant's first claim does not merit relief.

In his second issue, Appellant challenges the weight of the evidence. Appellant's Brief at 27. We begin by noting that "[a] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." **Commonwealth v. Thompson**, 106 A.3d 742, 758 (Pa. Super. 2014) (citation omitted). Our Supreme Court has clarified that, "[a] motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court." **Commonwealth v. Weathers**, 95 A.3d 908, 910-911 (Pa. Super. 2014), *appeal denied*, 106 A.3d 726 (Pa. 2015), *citing* **Commonwealth v. Diggs**, 949 A.2d 873, 879 (Pa. 2008), *cert. denied*, **Diggs v. Pennsylvania**, 556 U.S. 1106 (2009). Therefore, on appeal, the reviewing court "reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence." **Id.** Indeed, it is well established that it is for the factfinder to determine the weight given to the evidence produced at trial. **Commonwealth v. Ferguson**, 107 A.3d 206, 212 (Pa. Super. 2015) (citation omitted). Because it is the role of the factfinder to weigh the evidence, an appellant seeking to challenge the weight of the evidence carries a heavy burden.

> If the factfinder returns a guilty verdict, and if a criminal defendant then files a motion for a new trial on the basis that the verdict was against the weight of the evidence, a trial court is not to grant relief unless the verdict is so contrary to the evidence as to shock one's sense of justice.

*Id.* at 212-213. We also highlight that "[a] new trial is not warranted because of a mere conflict in the testimony and must have a stronger foundation than a reassessment of the credibility of witnesses." ***Commonwealth v. Gonzalez***, 109 A.3d 711, 723 (Pa. Super. 2015) (internal quotation marks and citation omitted). "[O]nly where the facts and inferences disclose a *palpable abuse of discretion* will the denial of a motion for a new trial based on the weight of the evidence be upset on appeal." ***Commonwealth v. Morales***, 91 A.3d 80, 91 (Pa. 2014) (emphasis in original; citation omitted).

Specifically, Appellant contends that it shocks the conscience that "Appellant did not have the basic human right to defend himself against the efforts by another person to split open his head." Appellant's Brief at 27. As we explained in our discussion of the sufficiency challenge, the Commonwealth presented sufficient evidence to disprove Appellant's self-defense claim beyond a reasonable doubt. The trial court concluded that "it is not the role of the trial court to reweigh the evidence, [so] we will not disturb the jury's credibility determination as to [Appellant]'s first-degree murder conviction. The jury's verdict of guilt was not so contrary to the evidence as to shock the conscience of th[e] [trial] [c]ourt." Trial Court

Opinion, 1/15/15, at 17. The jury, as factfinder, was free to believe the Commonwealth's evidence and determine the weight given to all of the evidence produced at trial. *See Ferguson*, *supra*. Moreover, Appellant is not entitled to a new trial based on a reassessment of the credibility of witnesses. *See Gonzalez*, *supra*. Therefore, we conclude the trial court did not palpably abuse its discretion in denying Appellant's motion for a new trial based on the weight of the evidence. *See Morales*, *supra*. Accordingly, we conclude Appellant's second issue does not warrant relief.

Based on the foregoing, we conclude both of Appellant's issues are devoid of merit. Accordingly, we affirm the July 18, 2014 judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/14/2015

- 18 -